## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Richard Allen Rosell | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 05-502 (RJL) |
| | ) | |
| Joseph T. Kelliher, | ) | |
|    Chairman, Federal Energy | ) | |
|    Regulatory Commission | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
(March **31**, 2006) [#8, 12, 16]

Plaintiff Richard Allen Rosell brings this action against defendant Joseph Kelliher,[1]

in his capacity as Chairman of the Federal Energy Regulatory Commission ("FERC" or "the

Comission"), alleging that he was discriminated against on the basis of his disability and age

in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*,

and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*,

respectively, and subjected to unlawful retaliatory harassment and discharge. Additionally,

plaintiff claims that defendant breached the employment contract between the parties by

denying plaintiff the severance pay to which he believes he is entitled. This matter is now

before the Court on plaintiff's Motion for Summary Judgment as to Counts I, II, III and VII

---

[1]    The original named defendant in this action was Patrick Henry Wood, III, the former Chairman of FERC. Pursuant to Federal Rule of Civil Procedure 25(d)(1), "[w]hen a public officer is a party to an action in an official capacity and during its pendency . . . ceases to hold office, . . . the officer's successor is automatically substituted as a party." Accordingly, Mr. Kelliher is substituted for Mr. Wood.

of the Complaint, defendant's Cross Motion to Dismiss or, in the Alternative, for Summary

Judgment, and plaintiff's Supplemental Motion for Summary Judgment as to Counts IV, V

and VI of the Complaint.  Upon consideration of the parties' submissions and the entire

record herein, the defendant's motion is GRANTED and plaintiff's motions are DENIED as

moot.

## BACKGROUND

Plaintiff Richard Allen Rosell was born on April 22, 1952 and thus, was over forty

years of age for the entire time period relevant to his Complaint.  (Compl. ¶ 5.)  From

September 21, 1979 to May 14, 2004, plaintiff served in the position of Auditor at FERC.

(*Id.* ¶ 7, 12B.)  The following is a brief summary of plaintiff's medical history.[2]  Since his

early twenties, plaintiff has suffered from Labile Hypertension, or severe high blood

pressure.  (*Id.* ¶ 11A.)  Although he was able to contain the condition during his youth, it has

since degenerated and has defied control despite multiple medications and frequent

adjustments thereto.  (*Id.*)  In his early thirties, plaintiff was diagnosed with Labile Diabetes

Type II with alternating episodes of hypoglycemia and symptomatic hyperglycemia (blurred

vision, malaise, fatigue and dehydration).  (*Id.* ¶ 11B.)  Since the mid-to-late 1980s, plaintiff

has suffered from gait instability associated with vertigo of unknown etiology.  (*Id.* ¶ 11C.)

This results in blurred vision and virtual blindness as well as loss of balance and control.

(*Id.*)  Due to the frequency and suddenness of these episodes, plaintiff was forced to cease

---

[2]     Both the plaintiff and defendant have stipulated to the following information as
material facts that are not in dispute.  (*See* Def's. Statement of Material Facts Not in Dispute.)

2

driving in 1987. (*Id*.) In the early 1990s, plaintiff began suffering from severe insomnia. (*Id*. ¶ 11D.) Plaintiff was diagnosed with coronary arteriosclerosis, in July 2003, and despite surgical interventions, the condition is degenerative. (*Id*. ¶ 11F.) In June or July 2003, plaintiff began suffering from large bladder diverticulum, which causes urinary retention and recurrent urinary tract infections, forcing plaintiff to rely on self-catheterization. (*Id*. ¶ 11G.) Plaintiff's reliance on a catheter has exacerbated his disposition to recurrent infections and hospitalizations. (*Id*.) In May 2004, the month that he retired, plaintiff reports that he was urinating more blood than urine and that his doctor was attempting to schedule him for a risky surgery that would require prolonged recovery in a nursing home. (*Id*.) Plaintiff's debilitating conditions have worsened with the passage of time. (*Id*. ¶ 35.) Since leaving his position at FERC, plaintiff has become dependent on his ailing mother and sister, under whose care he now survives. (*Id*. ¶ 13B.)

Through much of his career, plaintiff's disabilities have affected his time and attendance, leave reporting, and leave balance records. (*See id*. ¶ 15.) Plaintiff's supervisors, knowing of his afflictions, have given him cautionary warnings to improve his time and attendance, and advised him that he had low leave balance records. (*Id*.) When the defendant found that plaintiff's compliance with attendance requirements was unacceptable, plaintiff was issued a Leave Restriction Notification (LRN). (*Id*. ¶ 16.) The LRN informed plaintiff that all unauthorized absences were to be thereafter charged as Absent Without Leave ("AWOL") status. (*Id*. ¶ 16A.) The LRN also required plaintiff to support all illness-

related absences with a physician's statement and make emergency leave requests no later than 8:15 a.m. on the day of requested leave. (*Id.* ¶ 16C-E.) Predicting that the LRN was incompatible with his disabilities, plaintiff filed a grievance with his first level supervisor on February 25, 2003, in addition to filing a complaint of discrimination on March 7, 2003. (*Id.* ¶ 17.) On July 18, 2003, plaintiff was suspended for three days without pay for alleged violations of the LRN. (*Id.* ¶ 19C.)

On December 1, 2003, defendant placed plaintiff on a Performance Improvement Plan[3] ("PIP"), and on April 15, 2004, defendant issued plaintiff a Notice of Proposed Removal from Federal Service due to Unacceptable Performance ("NFP"). (*Id.* ¶ 42H.) The NFP outlined alleged deficiencies in plaintiff's work performance and recommended that plaintiff be removed from federal service within thirty days. (*See* Opp'n to Pl.'s Mot. for Summ. J. and Def.'s Cross Mot. to Dismiss or in the Alternative, for Summ. J. ("Def.'s Mot.") at Ex. 7.) On May 5, 2004, plaintiff submitted an Application for Immediate Retirement and subsequently retired on May 14, 2003. (Def.'s Mot. at 11.) Plaintiff filed the current action in this Court on March 11, 2005.

## DISCUSSION

I.    *Standard of Review*

Before the Court are plaintiff's Motion for Summary Judgment as to Counts I, II, III

---

[3] The PIP was issued to plaintiff by a Supervisory Auditor in the Office of the Executive Director at FERC and stipulated that unless plaintiff meet "minimally successful" levels in five "critical elements" concerning his job performance, he would be subject to a reduction in grade or removed from Federal service based on unacceptable performance. (*See* Opp'n to Pl.'s Mot. for Summ. J. and Def.'s Cross Mot. to Dismiss or in the Alternative, for Summ. J., Exhibit 6.)

and VII of the Complaint, defendant's Cross Motion to Dismiss or, in the Alternative, for

Summary Judgment, and plaintiff's Supplemental Motion for Summary Judgment as to

Counts IV, V and VI of the Complaint.  Because both parties have presented materials

outside the pleadings – which the Court must rely upon in evaluating several of plaintiff's

claims – the Court will decide the Motion in accordance with Rule 56, rather than as a

motion to dismiss.  *See* Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings,

matters outside the pleadings are presented to and not excluded by the court, the motion shall

be treated as one for summary judgment and disposed of as provided in Rule 56."); *see also*

*Brug v. Nat'l Coalition for the Homeless*, 45 F. Supp. 2d 33, 36 n. 3 (D.D.C. 1999) (finding

that where both parties have presented materials outside the pleadings it will be fair to treat

defendant's motion as one for summary judgment).

Pursuant to Rule 56, summary judgment shall be granted when the record

demonstrates "that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes over non-material facts may be resolved in

favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Where facts material to the outcome of the case are at issue, however, the motion may not

be disposed of by summary judgment.  *Id.* at 248.  If the facts in dispute are "merely

colorable, or . . . not significantly probative, summary judgment may be granted." *Id.* at 249-

50.  A party opposing a motion for summary judgment "may not rest upon the mere

allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248; *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255. If there is insufficient evidence indicating that a jury could return a favorable verdict for the nonmoving party, then summary judgment is proper. *See Nat'l Geographic Soc'y v. Int'l Media Ass'n, Inc.*, 732 F. Supp. 4, 4 (D.D.C. 1990). Both parties agree that this case is ripe for summary disposition.[4]

II.    *Count I:  Unlawful Discrimination on the Basis of Disability in Violation of the Rehabilitation Act*

Disability discrimination claims brought pursuant to the Rehabilitation Act are resolved under the burden-shifting standard set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *Barth v. Gelb*, 2 F.3d 1180, 1185 (D.C. Cir. 1993). Under this scheme, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Once the plaintiff makes such a showing, the burden shifts to the defendant employer to specify "some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* "Assuming . . . that the

---

[4]    "Notwithstanding the parties' discord, it is apparent that both parties share common persuasion that this, indeed, is a case ripe and appropriate for summary disposition within the purview of this Court's Case Management Order, filed March 21, 2005, 'to secure the just, speedy, and inexpensive determination of [this] action.'" (Pl.'s Opp'n to Def.'s Cross Mot. to Dismiss or, in the Alt., for Summ. J., Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J., and Pl.'s Supp. Mot. for Summ. J. as to Counts IV, V and VI of the Compl. ("Pl.'s Opp'n") at 4.)

employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at . . . summary judgment . . . will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

To establish a prima facie case of disability discrimination under the Rehabilitation Act, plaintiff must show that "he (1) is an individual with a disability (2) who, with or without reasonable accommodation, can perform the essential functions of the position, and (3) who suffered an adverse employment decision due to [his] disability." *Baloch v. Norton*, 355 F. Supp. 2d 246, 255 (D.D.C. 2005). Unfortunately for plaintiff, he is unable to get past the first prong of this analysis.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Equal Employment Opportunity Commission's ("EEOC") regulations

7

define "qualified individual with a disability" as "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). While defendant does not dispute plaintiff's skill, education, or expertise (Def.'s Mot. at 14 n.7), he does assert that "[p]laintiff clearly did not, when he retired and for some period before that, have the ability, even with reasonable accommodations, to perform the essential functions of the Senior Auditor position" (*id.* at 14). Defendant's position is readily borne out by the record before this Court.

The essential functions of a Senior Auditor are clearly outlined by the Office of the Chief Accountant in its official description of the position. (*Id.*[5]) These functions include, *inter alia*, interaction with others inside and outside FERC; attending and conducting trainings, attending conferences, conducting negotiations, and participating in team projects. (*Id.* at 15.) Other duties include temporary travel, providing guidance to junior level staff, and performing tasks under short deadlines. (*Id.*)

In the course of his employment with defendant, plaintiff submitted two letters from his doctor, Dr. Melanie J. Blank, recommending particular accommodations that – in the

---

[5]    All citations to the parties' briefs incorporate the exhibits attached thereto. The Court will not reference a particular exhibit unless that exhibit is (1) quoted directly or (2) a sworn affidavit.

doctor's estimation – would allow him to perform the essential functions of his job.[6]  For example, Dr. Blank recommended a "[f]lexible work reporting schedule as an allowance for [plaintiff's] frequent exacerbations of illness." (M. Blank Ltr. to FERC (Mar. 28, 2004) at 2 (attached to Def.'s Mot. as Ex. 2).)  In explaining this recommendation, Dr. Blank wrote: "A flexible work schedule would allow the patient to report to work at nondesignated times in the event of an exacerbation of his many illnesses. This accommodation would enable Mr. Rosell to call or report to work at a time when he [is] medically able."[7]  (*Id.*)  Defendant argues that allowing plaintiff to report to work whenever he was able would have placed an undue burden on plaintiff's supervisors and fellow employees. (*See* Def.'s Mot. at 15-17.) I agree.  One of the most fundamental requirements of any position is reporting for work. *See Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994) ("We agree with the proposition that an essential function of any government job is an ability to appear for work . . . and to complete assigned tasks within a reasonable period of time."); *see also id.* at 530-31 (finding that

---

[6]      Dr. Blank's conclusion that plaintiff "is capable of performing the duties of his job subject to the recommendations . . . made regarding his work schedule and work environment" (M. Blank Ltr. to FERC (Mar. 28, 2004) at 1 (attached to Def.'s Mot. as Ex. 2)) does not present a genuine dispute of material fact that impacts this Court's summary judgment analysis.  Even assuming that the accommodations recommended by Dr. Blank would have enabled plaintiff to perform the essential duties of his position – of which plaintiff presents no evidence that Dr. Blank was in fact aware – such a finding would have no bearing on this Court's conclusion that Dr. Blank's recommendations were unreasonable or unduly burdensome as a matter of law.

[7]      The other accommodations recommended by Dr. Blank include: (1) access to a private bathroom to allow plaintiff privacy for his frequently scheduled self catheterization; (2) rest periods of 10 minutes every 2 hours due to fatigue and needed glucose and BP monitoring; (3) reduction in workload, particularly assignments with tight deadlines; (4) reduction in noise levels around plaintiff's workspace; and (5) avoidance of assignments that require travel outside of a fifty mile radius from plaintiff's office.

plaintiff's "prolonged, frequent and unpredictable absences render her unqualified for any government job"); *Sampson v. Citibank*, 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (holding that an employee who cannot meet the attendance requirements of the job is not a "qualified individual" under the Americans with Disabilities Act[8]); *Walders v. Garrett*, 765 F. Supp. 303, 309-10 (E.D. Va. 1991), *aff'd*, 956 F. 3d 1163 (4th Cir. 1992) ("Few would dispute that, in general, employees cannot perform their jobs successfully without meeting some threshold of both attendance and regularity.  The weight of authority supports this commonsense conclusion.").[9]

Thus, this Court finds that plaintiff is not a "qualified individual" for Rehabilitation Act purposes because he simply could not have performed the essential functions of his position with or without reasonable accommodation.  Indeed, plaintiff's own Complaint

---

[8]     The standards applied to the ADA, 42 U.S.C. § 12111, *et seq.*, are used to determine whether an individual has been discriminated against under the Rehabilitation Act. *See* 29 U.S.C. § 794(d).

[9]     The recent EEOC decision in *Kendall v. Ashcroft*, 2005 EEOPUB LEXIS 350 (2005) is instructive. In *Kendall*, the EEOC reviewed the case of an employee who was unable to report to work at the designated time on a regular basis because he suffered from delayed sleep phase syndrome and sleep apnea.  The Commission found:

> [T]he record indicates that the only effective accommodation would have been to allow plaintiff to report to work whenever he was able.  However, such an accommodation is not reasonable on its face.  It is not 'plausible' or 'feasible' for an employer to excuse chronic erratic absenteeism and tardiness by an employee who cannot give timely notice sufficient to enable the employer to ensure adequate staffing.  Thus, the Commission concludes that [the employee] failed to show that there was an effective and feasible accommodation that the agency could have provided.

*Kendall*, 2005 EEOPUB LEXIS 350, at *6-7 (internal citations omitted).

supports this conclusion. Plaintiff himself attests to the fact that upon his retirement in May 2004, he became "dependent on his ailing mother and sister under whose care he now survives." (Compl. ¶ 13B; *see also id.* ¶¶ 11A-I, 13A) And in the very same letter that plaintiff uses to support his request for reasonable accommodation, Dr. Blank reports that "since July 2003 [plaintiff's] conditions have worsened, resulting in seven hospitalizations for a variety of reasons since that time." (M. Blank Ltr. to FERC (Mar. 28, 2004) at 1.)[10] And even if plaintiff could have partially performed his duties with Dr. Blank's accommodations in place, such accommodations would have been unduly burdensome to the defendant and were thus unreasonable in the aggregate. Simply stated, plaintiff cannot establish a prima facie case of discrimination under the Rehabilitation Act.

Even if plaintiff were able to make out a prima facie case of disability discrimination, however, he is unable to rebut defendant's showing of a legitimate, nondiscriminatory reason for the Commission's employment decisions. As outlined above, plaintiff was issued an LRN in February 2003 in response to a concern regarding his "frequent unscheduled absences, [his] failure to properly request leave, and [his] low leave balances." (M. Oliva Mem. to R. Rosell (Feb. 14, 2003) at 1 (attached to Def.'s Mot. as Ex. 3).) Mr. Michael Oliva, Director of the Division of Regulatory Audits in the Office of the Executive Director, explained to plaintiff the effect that his frequent, unscheduled absences had on the

---

[10]    Dr. Blank's letter also states that plaintiff's conditions are "chronic and the prognosis is therefore relatively poor for a complete or even partial recovery." (M. Blank Ltr. to FERC (Mar. 28, 2004) at 2.) Furthermore, "medical management of [plaintiff's] multiple medical conditions [is] extremely challenging due to frequent adverse reactions to medications." (*Id.*)

Commission as follows:

> Your absenteeism places undue hardship on others in the workplace that have
> to do your work while you are absent.  In turn, your lack of dependability and
> reliability in performing audits and in reporting to work prevents me from
> planning and scheduling, and it adversely affects my ability to carry out my
> responsibilities to assure that the work of the office is completed in a timely,
> fair and efficient manner.

(*Id.*)  Between February 14, 2003 and July 18, 2003, while subject to the LRN issued by Mr.

Oliva, plaintiff accumulated at least six unauthorized absences and failed to properly request

and receive approval for leave.  (M. Oliva Mem. to R. Rosell (July 18, 2003) at 1-3 (attached

to Def.'s Mot. as Ex. 4).).  These violations of the LRN were documented in detail.  (*See*

*generally id.*)  Then, in December 2003, as a result of plaintiff's "Unacceptable" performance

during the period from July 2003 through November 2003, defendant established a PIP for

plaintiff "to help [him] improve and maintain an acceptable level of performance."  (D.

Siddell Mem. to R. Rosell (Dec. 1, 2003) at 1 (attached to Def.'s Mot. as Ex. 6).)

Defendant's decision in this regard was based, *inter alia*, on plaintiff's "failure to meet audit

milestones, effectively communicate with the company, and perform sufficient analysis."

(*Id.*)  In issuing the PIP to plaintiff, Mr. Dwight Siddell, Supervisory Auditor in the Office

of the Executive Director,  explained:

> Since our performance discussion in mid-July . . . your performance has
> steadily deteriorated.   Your working papers continue to lack sufficient
> documentation. In addition, your working papers regularly include statements
> and comments that are irrelevant to the audit and are inappropriate for working
> papers that are intended to document analysis and other work performed. Your
> lack of feedback to your Project Manager and/or Team Leader on your audit
> progress and decision making processes has grown worse, creating a critical,

> sustained lack of communication.  In addition, I am particularly concerned
> with your lack of timeliness in submitting your work products.

(*Id.* at 2.)  After being given a reasonable opportunity to improve, plaintiff's performance

remained unacceptable in the estimation of his superiors, and on April 15, 2004, plaintiff was

issued an NPR.  (*See generally* D. Siddell Mem. to R. Rosell (Apr. 15, 2004) (attached to

Def.'s Mot. as Ex. 7).)   Thus, as illustrated, the record is replete with legitimate,

nondiscriminatory reasons for defendant's employment decisions.  Because plaintiff is unable

to rebut defendant's justifications, he does not meet his burden of persuasion under

*McDonnell Douglas*.  Count I must therefore be dismissed.

III.    *Count II:   Unlawful Discharge on the Basis of Disability in Violation of the
        Rehabilitation Act*

   Plaintiff next alleges that he was forced into early retirement as a direct result of

unlawful discrimination on the basis of his disability.[11]  Because the Court has determined

that plaintiff is not a "qualified individual" under the Rehabilitation Act, it need proceed no

further with the analysis of this claim.   Count II of plaintiff's Complaint is therefore

dismissed.

IV.    *Count III:  Unlawful Discrimination on the Basis of Age in Violation of the ADEA*

   Count III of plaintiff's Complaint charges defendant with age discrimination in

violation of the ADEA.   Specifically, plaintiff alleges that "soon after he turned fifty,

Defendant withdrew the tolerance and accommodation Plaintiff had benefitted from through

---

[11]    The issue of whether plaintiff's retirement can be deemed a constructive discharge
is discussed in Section VII, *infra*.

much of his youthful career, subjected him to employment mandates and conditions beyond his capacity to fulfill due to his disabilities, and forced the early retirement of the Plaintiff at age fifty-two."[12]  (Compl. ¶ 36.)  Essentially, plaintiff alleges that he was treated better when he was younger.  This claim cannot stand.[13]

To establish a prima facie case of age discrimination, the plaintiff must "demonstrate facts sufficient to create a reasonable inference that age discrimination was 'a determining factor' in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856-57 (D.C. Cir. 1982).  Such an inference is created if the plaintiff shows that (1) he belongs to the statutorily protected age group (*i.e.*, forty to seventy years of age); (2) he was qualified for his position and was performing his job well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action despite his qualifications and performance; and (4) he was disadvantaged in favor of similarly-situated younger employees. *Baloch*, 355 F. Supp. 2d at 255.  Although plaintiff was over the age of forty at all times relevant to his Complaint, plaintiff is unable to demonstrate that he was performing his job well enough to meet his employer's expectations. *See supra* Section II.  Additionally, plaintiff does not establish – let alone allege – that he was disadvantaged in favor of similarly-situated younger

---

[12]    Plaintiff's age discrimination claim appears to be intermingled with a claim of discrimination based on disability. To the extent that Count III also alleges disability discrimination, the Court rests on the analysis employed in its disposition of Counts I and II.

[13]    With no citation to any legal authority whatsoever, plaintiff asserts that "[t]he difference between plaintiff's treatment by the defendant when he was younger (his thirties and forties) and older (fifty-one plus) is precisely what [sic] *prima facie* case of age discrimination is made of." (Pl.'s Opp'n at 28 (italics in original).)  Regrettably for plaintiff, the use of multiple exclamation points, all caps, and bolded text is no substitution for citation to binding legal precedent.

employees. Instead, he bases his Count III age discrimination claim on the assertion that

defendant treated him more favorably when he was in his thirties and forties.[14]  (Compl. ¶

36.)  Such an allegation does not establish a cause of action under the ADEA.  As such,

Count III must also be dismissed.[15]

## V.    *Count IV: Unlawful Discrimination on the Basis of Age in Violation of the ADEA*

In Count IV of his Complaint, plaintiff alleges that defendant discriminated against

him and other older workers in order to replace them with younger employees.  Because, as

discussed above, plaintiff is unable to establish that his job performance was satisfactory at

the time of the employment actions or conditions of which he complains or that he was

personally disadvantaged in favor of a younger employee, he cannot make out a prima facie

case of age discrimination. *See supra* Section IV.  However, two aspects of plaintiff's claims

in relation to Count IV are of particular note.  First, in support of his age discrimination

charge, plaintiff relies heavily on the following quote from Mr. Michael Oliva, Director of

---

[14]    Individuals become eligible for protection under the ADEA once they reach the age
of forty. Although plaintiff was employed by defendant between the ages of forty and fifty, plaintiff
does not allege that he was discriminated against on the basis of his age until "soon after he turned
fifty." (Compl. ¶ 36.)  This time period coincides with the change in plaintiff's supervisor (*see*
Def.'s Reply at 6) and the worsening of his physical condition (*see* M. Blank Ltr. to FERC at 1 ("It
is only since July 2003 that his conditions have worsened, resulting in seven hospitalizations for a
variety of reasons since that time.").

[15]    As are claims of disability discrimination under the Rehabilitation Act, age
discrimination claims brought pursuant to the ADEA are subject to the *McDonnell Douglas* burden-
shifting framework. *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004). As
such, even if plaintiff were able to make out a prima facie case of age discrimination, he would be
unable to overcome the summary judgment analysis set forth in *Aka v. Washington Hospital Center*,
156 F.3d 1284, 1289 (D.C. Cir. 1998), outlined above, as defendant has presented several legitimate,
non-discriminatory reasons for the Commission's actions that have gone unrebutted by plaintiff.

the Division of Regulatory Audits in the Office of the Executive Director:

> Regarding the structure of our office – at one time the division had two project managers, who were GS 15's [sic] who had the overall responsibility, [sic] for managing audits. We also have team leaders, who are responsible for managing the audit on-site. The Team Leaders are GS-14's [sic], but can be GS-13's [sic]. **We now have a lot more junior people doing the work.** I now only have one project manager."

(Compl. ¶ 40 (emphasis in original).) This statement, with nothing more, is insufficient to create a reasonable inference of age discrimination. It is merely a statement of fact regarding the changing structure of plaintiff's office. Further, defendant's decision to restructure the Office of the Executive Director is not subject to judicial review. A District Court is not permitted to "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982); *see also Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (finding that a district judge does not sit as a "super-personnel department that reexamines an entity's business decisions"). No such motive has been demonstrated here.

Second, plaintiff cites student loan abatement and discounted loan benefit programs as "unusual employment incentives" that defendant used to "squeeze out" older, more experienced auditors. (Compl. ¶ 38.) Student loan abatement and discounted loan benefit programs are in no way "unusual employment incentives" aimed at disadvantaging older workers. These programs are government-wide benefits adopted by Congress to encourage recent graduates with significant student loans to work for the federal government. *See* 5 C.F.R. Part 537. Moreover, these programs are available to all employees who wish to take

advantage of – not just to persons under forty.  Accordingly, plaintiff's allegations in this

regard in no way support a finding of age discrimination.  Such unsubstantiated allegations

are not based on the type of *reasonable* inferences this Court may draw in favor of the non-

moving party upon a motion for summary judgment.  *See Anderson*, 477 U.S. at 255.  Count

IV is therefore dismissed.

VI.    *Count V:  Retaliation and Retaliatory Harassment*

Plaintiff's Count V claim is one of retaliation and retaliatory harassment.  To make

out a prima facie case of retaliation a plaintiff must "demonstrate:  (1) that []he engaged in

a statutorily protected activity; (2) that the employer took an adverse personnel action; and

(3) that a causal connection existed between the two."  *Stewart v. Evans*, 275 F.3d 1126,

1134 (D.C. Cir. 2002).  Like discrimination claims brought pursuant to the Rehabilitation Act

and the ADEA, claims of retaliation are subject to the *McDonnell Douglas* burden-shifting

framework.  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  Thus, as with

plaintiff's discrimination claims, even if he were able to make out a prima facie case of

retaliation,[16] plaintiff has not proffered sufficient evidence to rebut the Commission's

---

[16]    Although this Court finds – and defendant does not dispute (Def.'s Mot. at 32) – that
plaintiff did in fact engage in statutorily protected activity, the conduct of which plaintiff complains
in Count V either (1) does not qualify as an "adverse personnel action," *see Stewart v. Evans*, 275
F.3d 1126, 1134 (D.C. Cir. 2002) ("An employment decision does not rise to the level of an
actionable adverse action . . . unless there is a tangible change in the duties or working conditions
constituting a material employment disadvantage." (citation and internal quotation marks omitted;
alteration in original); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A
tangible employment action constitutes a significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly different responsibilities, or a decision
causing a significant change in benefits."); or (2) lacks a causal connection to the protected activity

showing of a legitimate, nondiscriminatory reason for its actions. *See supra* Section II. As such, Count V must likewise be dismissed.

VII.    *Count VI: Retaliatory and/or Constructive Discharge*

In Count VI of the Complaint, plaintiff claims that he was constructively discharged and forced into retirement by the alleged retaliatory actions of the defendant.[17] As with Count V, plaintiff is unable to rebut the Commission's showing of a legitimate, nondiscriminatory reason for its actions. Thus, Count VI must also fail.

Furthermore, plaintiff's argument that he was constructively discharged by defendant is inherently flawed. A claim of constructive discharge requires the plaintiff to show that "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment." *Turner v. District of Columbia*, 383 F. Supp. 2d 157, 171 (D.D.C. 2005); *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (holding that a "finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee" out (citations omitted)). Constructive discharge requires the plaintiff to show working conditions "so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). The normal and everyday stress associated with

_____

in which plaintiff engaged.

[17]    Count VI also contains most, if not all, of the allegations that are the subject of Count V. To the extent that this is the case, these claims are dismissed.

18

working is not enough to amount to constructive termination. *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers."). In fact, this Court has held that an employer is not liable for constructive discharge when an employee's stress-related health problems mandate resignation, even if those problems are caused by the demands or criticisms of the employer. *Johnson v. Ashcroft*, Civ.A.No. 02-1745 (RMU), 2005 WL 2064095, at *5 n.5 (D.D.C. 2005); *see also Spence v. Md. Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) ("A constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health. But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.") (citations and quotations omitted). Nor will it suffice to establish constructive discrimination where "some of [plaintiff's] superiors spoke of early retirement or were even urging his termination." *See Bristow*, 770 F.2d at 1256. *But cf. Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990) (finding where an ultimatum of retire or be fired is given, the jury could reasonably conclude there

19

was constructive termination); *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1113 (1st Cir. 1989) (finding where plaintiff is confronted with a retire or be fired choice, the choice to retire can not be seen as voluntary). While it may have been suggested to plaintiff that he should retire, plaintiff was never given an ultimatum to do so. Rather, plaintiff, in evaluating the circumstances of his declining health and deteriorating job performance made his choice to resign. He cannot now claim that defendant forced him to do so.

VIII.  *Count VII:  Unlawful Denial of Employment Benefits and/or Breach of Contract*

Count VII of plaintiff's Complaint alleges that he suffered unlawful denial of employment benefits and/or breach of contract. Specifically, plaintiff argues that according to the defendant's procedural manual, employees who are involuntarily separated from employment are entitled to severance pay. Plaintiff's claim fails in the face of this Court's determination that plaintiff voluntarily retired and thus was not involuntarily discharged.[18] As discussed above, plaintiff's argument that his voluntary separation was a constructive discharge is legally unsupportable. Accordingly, plaintiff's severance claim must be dismissed.

## CONCLUSION

For all of the foregoing reasons, defendant's Cross Motion to Dismiss or, in the

---

[18]    Defendant also argues that Count VII must fail because plaintiff falls within an exception to the severance pay policy as he is eligible for an immediate annuity. Defendant, however, has failed to reveal on what grounds it has determined that plaintiff qualifies for such an annuity. Thus, the Court does not consider this basis for dismissal.

Alternative, for Summary Judgement is GRANTED and plaintiff's motions are DENIED.

An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge